IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAWRENCE ALEXANDER JR., ELLIS      )
ALLEN, MITCHELL ALSTON, FRANCES R. )
BANKS, AHMED BLAKE, MICHAEL O.     )
BRODIE, KEVIN E. CHANDLER,         )
CHARLES E. CHERRY, ERNEST          )
CUTHBERTSON, DARRIN DAVIS,         )
STEVEN A. EVANS, WILLIAM GRAVES,   )
MILFORD J. HARRIS II, JONATHAN     )
HEARD, ANTUAN HINSON, STEPHEN L.   )
HUNTER, BRIAN JAMES, DEMETRIUS     )
W. JOHNSON, JOHN O. LEGRANDE,      )
GEORGE M. LITTLE, DARRELL          )
MCDONALD, C.L. MELVIN, STACY A.    )
MORTON JR., WILLIE PARKER, LARRY   )
PATTERSON JR., WILLIAM A. PHIFER,  )
JOSEPH PRYOR, NORMAN RANKIN,       )
WAYNE REDFERN, ALEXANDER RICKETTS, )
RONALD ROGERS, STEVEN SNIPES,      )
CALVIN STEVENS JR., ERIC           )
STEVENSON, JERMEIR JACKSON-STROUD, )
JULIUS TUNSTALL, ALLEN WALLACE,    )
FRANK YOUNG and MICHAEL WAYLAND    )
WALL,                              )
                                   )
          Plaintiffs,              )
                                   )
     v.                            )      1:09-CV-934
                                   )
CITY OF GREENSBORO,                )
                                   )
          Defendant.               )

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

     Before the court is the motion to dismiss of Defendant City

of Greensboro ("the City") pursuant to Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6).  (Doc. 7.)  Plaintiffs oppose

the motion.  (Doc. 15.)  For the reasons set forth below, the motion will be granted in part and denied in part.

## I.    BACKGROUND

Plaintiffs commenced this action in this court on December 7, 2009.  (Doc. 1.)  They filed an Amended Complaint on March 15, 2010.  (Doc. 4.)  For purposes of this motion to dismiss, the court will view all factual allegations in the Amended Complaint in the light most favorable to Plaintiffs as the non-moving parties.  Ibarra v. United States, 120 F.3d 472, 474 (4th Cir. 1997).

Plaintiffs[1] are all African-American/black police officers employed by the City through the Greensboro Police Department ("GPD") when David Wray ("Wray") was promoted to Chief of Police and Gilmer Brady ("Brady") to Deputy Chief.  Both Wray and Brady are white.

After their promotions, Wray and Brady allegedly directed subordinate officers to gather pictures of black GPD officers for line-up books and other visual aids that were sometimes referred to as the "Black Book."  Plaintiffs contend, upon information and belief, that their photographs, likenesses, or names were included in at least one version of the Black Book,

---

[1]    Thirty-nine Plaintiffs are named in the caption of the Amended Complaint; Darryl Stevenson is identified as a Plaintiff in paragraph 27 of the Amended Complaint yet is not listed in either the caption or introductory paragraph.

which Scott Sanders ("Sanders") — an officer assigned to the GPD's Special Intelligence Section ("SID") — and other non-black officers showed on numerous occasions to the general public and criminal suspects in an effort to implicate black GPD officers in wrongdoing. Plaintiffs allege that the Black Book was not compiled or used for any legitimate investigatory purpose.[2]

According to Plaintiffs, Wray, Brady, and the City improperly used the SID, which was created to investigate groups like the Ku Klux Klan and street gangs, to investigate black GPD officers, including Plaintiffs, even though the GPD had a Criminal Investigation Division ("CID") whose purpose was to investigate officer misconduct. Wray and Brady instructed SID officers to investigate black GPD officers numerous times without following GPD standards. On several occasions, they allegedly investigated black GPD officers and their families despite no complaints having been made against the officers. When third parties alleged misconduct by GPD officers, moreover, the SID unit targeted only the black officers involved. Upon instructions of Wray and Brady, and contrary to GPD policy, black officers were allegedly investigated without any reasonable suspicion of unlawful conduct in order to test the officers' honesty and to entrap them. Plaintiffs claim that the

---

[2] The City contends that the Black Book and subsequent investigations stemmed from an allegation that a uniformed GPD officer sexually assaulted a female. (Doc. 4 ¶ 64; <u>see</u> Doc. 5 at 30.)

actions of SID officers created an atmosphere of fear, distrust, and suspicion and undermined the morale of the GPD.

Plaintiffs allege that at the direction of Wray and Brady, Sanders placed keystroke-monitoring devices on the computers "of numerous Plaintiffs and other African-American officers of the [GPD]" without just cause. (Doc. 4 ¶ 101.) Plaintiffs identify only Plaintiff Antuan Hinson ("Hinson"), however, as one whose computer was allegedly monitored for keystrokes to determine a password to allow Sanders to enter his email account and download around one year of his emails.

Plaintiffs also allege that "on numerous occasions" Wray disparately disciplined black GPD officers and pressured subordinates to alter findings and evaluations "in order to make such determinations less favorable to African-American officers of the [GPD]." (Id. ¶¶ 91-92.) The Amended Complaint alleges as "examples," however, only instances relating to Plaintiffs William A. Phifer ("Phifer") and Stephen L. Hunter ("Hunter"). It also alleges that Plaintiffs Brian James ("James") and Lawrence Alexander Jr. ("Alexander") were interrogated by Sanders as part of criminal investigations, although the conduct being investigated allegedly did not warrant criminal questioning.

Plaintiffs allege generally that the City "repeatedly, intentionally, and continuously" throughout Wray's and Brady's

tenures at the GPD failed to promote black officers to positions for which they were qualified and should have been promoted, although no instance of a Plaintiff being denied a promotion is alleged. (Id. ¶ 106.) Plaintiffs allege that even in cases where black GPD officers were promoted (Plaintiffs identify two such officers), such promotions were made only to suggest the appearance of equal treatment. Plaintiffs also allege generally that black GPD officers were "frequently and typically denied opportunities and benefits afforded to other officers," although Plaintiffs allege only facts relating to (1) a denial of reimbursement of expenses for the attendance of Plaintiff Steven A. Evans ("Evans") at a marksmanship certification program and (2) Wray's designation of white officers, instead of Evans, as marksmanship instructors at local community colleges and/or the Greensboro Police Academy. (Id. ¶ 108.)

Plaintiffs allege that the City "on numerous occasions violated the North Carolina Personnel Privacy Act in an effort to embarrass, intimidate, and/or discredit" black GPD officers, citing a June 2005 meeting with the Greensboro Police Officers Association during which Wray "publicly discussed the details of investigations into allegations of criminal conduct, identifying by name various black officers of the [GPD] in connection with such investigations." (Id. ¶ 112.) Plaintiffs also allege that the City "through its employees in positions of management of

the [GPD] instituted, ratified, and/or approved of" these discriminatory acts and that race "was at least a motivating factor for each of the unlawful employment practices described herein." (Id. ¶¶ 109, 111.)

On or about November 11, 2005, the City retained Risk Management Associates ("RMA"), a consulting firm, to investigate "allegations of wrongdoing by [the City] during David Wray's tenure as Chief." (Id. ¶ 96.) RMA interviewed 52 GPD officers and law enforcement officials as part of its review and on December 11, 2005, issued a report ("RMA Report") that allegedly found that "the GPD engaged in a number of illegal and or improper practices" that included "disparate treatment of African-Americans," "the appearance of racial targeting/discrimination," and "failure to follow procedures." (Id. ¶¶ 98-99.)

Ultimately, the City accepted the resignations of Wray (sometime in January 2006) and Brady (date not alleged). Thereafter, the City Attorney's office conducted its own review and issued a report ("City Legal Report"). Pages two through forty-four are attached to the Amended Complaint and incorporated therein by reference. (Doc. 5.) The City Legal Report details the findings of the City Attorney's office as to the circumstances alleged by the Plaintiffs herein and provides additional instances of alleged wrongful conduct directed toward

certain GPD officers.  Suffice it to say, however, the vast majority of the Plaintiffs are not mentioned in the City Legal Report.

Plaintiffs now bring claims against the City for discrimination on the basis of race in violation of Title VII of the Civil Rights Act of 1964 (as amended), 42 U.S.C. §§ 2000e <u>et seq.</u> ("Title VII").[3]  Plaintiffs seek compensatory and punitive damages as well as injunctive relief.  Before the court presently is the City's motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Doc. 7), which has been fully briefed (Docs. 8, 15, 16) and is ready for decision.

## II. ANALYSIS

The City bases its motion to dismiss upon both Rule 12(b)(1) and Rule 12(b)(6).  The City advances several arguments under each rule, each of which applies to a distinct set of Plaintiffs.  Therefore, the court will discuss each argument in turn.

---

[3]  In a parallel action removed to this court on April 17, 2009, Plaintiffs bring claims against the City, Wray, Brady, Sanders, and Greensboro City Council member Trudy Wade under 42 U.S.C. §§ 1981, 1983, and 1985(3), as well as North Carolina contract and tort law. (<u>See</u> Case No. 1:09-CV-293, Docs. 1, 5.)

## A. Standards of Review

### 1. Rule 12(b)(1)

The existence of subject matter jurisdiction is a threshold matter that a court must consider before it considers the merits of an action.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 93-95 (1998); Jones v. Am. Postal Workers Union, Nat'l, 192 F.3d 417, 422 (4th Cir. 1999).  A plaintiff bears the burden of proving this court's subject matter jurisdiction.  Richmond, Fredericksburg & Potomac R.R. Co. v. United States, 945 F.2d 765, 768 (4th Cir. 1991).  When evaluating a challenge to subject matter jurisdiction under Rule 12(b)(1), the court may look beyond the face of the complaint and consider other evidence outside the pleadings without converting the proceeding to one for summary judgment.  Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982).  A court should dismiss for lack of federal subject matter jurisdiction "only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law."  Richmond, 945 F.2d at 768.

### 2. Rule 12(b)(6)

The purpose of a Rule 12(b)(6) motion is to "test[] the sufficiency of a complaint" and not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."  Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992).  In considering a Rule

12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint," Erickson v. Pardus, 551 U.S. 89, 94 (2007) (per curiam), and all reasonable inferences must be drawn in the plaintiff's favor, Ibarra, 120 F.3d at 474.

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  Although the complaint need only "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957), abrogated on other grounds by Twombly, 550 U.S. 544), a plaintiff's obligation "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do," id.  Rule 12(b)(6) protects against meritless litigation by requiring sufficient factual information "to raise a right to relief above the speculative level" so as to "nudge[] the[] claims across the line from conceivable to plausible."  Id. at 555, 570; see Ashcroft v. Iqbal, 129 S. Ct. 1937, 1950-51 (2009).

Employment discrimination claims carry no heightened pleading standard, see Twombly, 550 U.S. at 569-70, nor must an employment discrimination complaint contain specific facts establishing a prima facie case, Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510-11, 515 (2002).  Yet the Fourth Circuit has

not interpreted <u>Swierkiewicz</u> as removing the burden of a plaintiff to plead facts sufficient to state all the elements of his claim. <u>Bass v. E.I. DuPont de Nemours & Co.</u>, 324 F.3d 761, 764-65 (4th Cir. 2003) (holding that the plaintiff failed to allege facts sufficient to support all the elements of her hostile work environment claim); <u>see also</u> <u>Jordan v. Alt. Res. Corp.</u>, 458 F.3d 332, 346-47 (4th Cir. 2006) (affirming the dismissal of a 42 U.S.C. § 1981 discrimination claim because the complaint did not allege facts supporting the assertion that race was a motivating factor in the plaintiff's termination). As is seen below, the court's task is made more difficult by the Amended Complaint's inclusion of forty apparent Plaintiffs under circumstances where most factual allegations, where they have any specificity, are related only generally or (as in most cases) not at all to any particular Plaintiff.

**B.    Arguments Brought Under Rule 12(b)(1)**

**1.    Plaintiffs who failed to receive an EEOC Notice of Right to Sue**

The City argues that the Title VII claims of Plaintiffs Ahmed Blake ("Blake"), Larry Patterson Jr. ("Patterson"), Frank Young ("Young"), and Darryl Stevenson ("D. Stevenson")[4] should be dismissed under Rule 12(b)(1) for failure to satisfy the jurisdictional prerequisites of Title VII by failing to receive

---

[4]    <u>See</u> <u>supra</u> note 1 on D. Stevenson's status as a Plaintiff.

a Notice of Right to Sue (sometimes called a "right-to-sue letter") from the EEOC. "[A] failure by the plaintiff to exhaust administrative remedies concerning a Title VII claim deprives the federal courts of subject matter jurisdiction over the claim." Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009). Title VII "specifies with precision the jurisdictional prerequisites that an individual must satisfy before he is entitled to institute a lawsuit." Alexander v. Gardner-Denver Co., 415 U.S. 36, 47 (1974). "These jurisdictional prerequisites include: (1) filing a Charge of Discrimination with the EEOC within 180 days of the occurrence of the alleged discrimination; (2) receiving a statutory Notice of Right to Sue; and (3) filing a lawsuit based on the Charge of Discrimination within 90 days of receiving the notice." Rorie v. Guilford Cnty. Sch., No. 1:06-CV-528, 2007 WL 1385655, at *2 (M.D.N.C. May 8, 2007); see 42 U.S.C. § 2000e-5(e)(1), (f)(1).

The Fourth Circuit has "long held that receipt of, or at least entitlement to, a right-to-sue letter is a jurisdictional prerequisite that must be alleged in a plaintiff's complaint." Davis v. N.C. Dep't of Corr., 48 F.3d 134, 140 (4th Cir. 1995);[5]

_____

[5] A few district courts have raised questions concerning the compatibility of Davis with the reasoning in Arbaugh v. Y & H Corp., 546 U.S. 500 (2006) (holding specifically that the numerical qualification in Title VII's definition of "employer" is an element of a plaintiff's claim for relief rather than a jurisdictional issue). See, e.g., Brown v. McKesson Bioservs. Corp., No. DKC 05-CV-0730, 2006 WL 616021, at *3-*5 (D. Md. Mar. 10, 2006). However, the Fourth

see also, e.g., Greene v. Swain Cnty. P'ship for Health, 342 F. Supp. 2d 442, 447 (W.D.N.C. 2004) ("Without a valid right to sue letter, a federal court lacks jurisdiction over the Title VII claims." (citing Davis)). "Thus, where '[n]either the complaint nor the amended complaint alleges' that the plaintiff has 'complied with these prerequisites,' the plaintiff has not 'properly invoked the court's jurisdiction under Title VII.'" Davis, 48 F.3d at 140 (alteration in original) (quoting United Black Firefighters of Norfolk v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979)).

Here, the Amended Complaint states that "[a]ll Plaintiffs received right-to-sue letters from the United States Department of Justice 90 days or less before the institution of this lawsuit" (Doc. 4 ¶ 45) and that "[a]ll conditions precedent to the institution of this lawsuit have been fulfilled" (id.). However, because the City contends that these jurisdictional allegations are not true as to Blake, Patterson, Young, and D. Stevenson, the court "is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside

---

Circuit has recently reaffirmed Davis, albeit without discussing Arbaugh, see Jones, 551 F.3d at 300, and this court is bound by directly controlling Fourth Circuit authority. Cf. Brooks v. Vassar, 462 F.3d 341, 360 (4th Cir. 2006) (stating that where a Supreme Court precedent is directly controlling but called into question by a later decision, lower courts must apply the directly controlling precedent unless clearly overruled). Moreover, no party has raised or briefed this issue. Therefore, the court will not pursue this question further.

the pleadings." Richmond, 945 F.2d at 768. The court "may consider evidence by affidavit, depositions or live testimony" and will "weigh[] the evidence to determine its jurisdiction." Adams, 697 F.2d at 1219. Plaintiffs bear the burden of proving subject matter jurisdiction in this context. Id.; see also Richmond, 945 F.2d at 768 ("The district court should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists.").

The City has provided affidavits from its Director of Human Resources, Connie D. Hammond (Doc. 10), and the City Attorney, A. Terry Wood (Doc. 11). Both affidavits testify that the City has neither received nor been made aware of right-to-sue letters issued by the EEOC to Blake, Patterson, Young, or D. Stevenson. (Doc. 10 ¶ 3; Doc. 11 ¶ 3.) Plaintiffs have failed to respond to the City's argument, thus providing no evidence that Blake, Patterson, Young, and D. Stevenson received right-to-sue letters or were entitled to such letters. Moreover, Plaintiffs do not even acknowledge the City's argument in their response brief.

While the Amended Complaint makes the general assertion that all Plaintiffs received right-to-sue letters, the evidence before the court is that Blake, Patterson, Young, and D. Stevenson did not receive such letters. As the court must

consider the issue of subject matter jurisdiction before considering the merits of the case, see Steel Co., 523 U.S. at 93-95, these four Plaintiffs have failed to carry their burden of proving the court's subject matter jurisdiction over their claims.   Therefore, all claims by Plaintiffs Blake, Patterson, Young, and D. Stevenson are dismissed for lack of subject matter jurisdiction.

### 2.   Plaintiff Mitchell Alston's claim

The City contends that this court lacks subject matter jurisdiction over the claim of Plaintiff Mitchell Alston ("Alston") because he failed to bring his claim within 90 days of receiving a Notice of Right to Sue from the EEOC.

A Title VII plaintiff must file a lawsuit based on an EEOC charge of discrimination within 90 days of receiving a Notice of Right to Sue.   42 U.S.C. § 2000e-5(f)(1); see Harvey v. City of New Bern Police Dep't, 813 F.2d 652, 653-54 (4th Cir. 1987). However, this is not an issue of subject matter jurisdiction, as the City does not contend that Alston failed to exhaust his administrative remedies; rather, the City contends that Alston was not timely in the exhaustion of his administrative remedies. While failure to exhaust administrative remedies deprives the federal courts of subject matter jurisdiction over a Title VII claim, untimeliness in the exhaustion of administrative remedies does not.   See Jones, 551 F.3d at 300 & n.2 (citing Zipes v.

Trans World Airlines, Inc., 455 U.S. 385, 393 (1982)); Shepard v. Lowe's Food Stores, Inc., No. 1:08-CV-679, 2009 WL 4738203, at *2 (M.D.N.C. Dec. 7, 2009) (stating, in the context of an ADA claim, that the 90-day filing requirement in 42 U.S.C. § 2000e-5(f)(1) "is a non-jurisdictional requirement" and "cannot form the basis of a Rule 12(b)(1) Motion to Dismiss"). Therefore, the City's argument is more properly considered under Rule 12(b)(6). See Shepard, 2009 WL 4738203, at *2.

The City attached to its motion to dismiss the right-to-sue letter that Alston received from the EEOC. (Doc. 8-3 at 45.) The right-to-sue letter was mailed to Alston on November 24, 2008. (Id.) As this action was filed on December 7, 2009, 378 days later, the City contends that Alston filed suit more than 90 days after receiving his right-to-sue letter. Plaintiffs provide no specific response to this argument, noting generally that a Rule 12(b)(6) dismissal on limitations grounds is inappropriate unless it appears on the face of the complaint that the limitations period has run. See Goodman v. Praxair, Inc., 494 F.3d 458, 464 (4th Cir. 2007) (en banc) (holding that a statute of limitations defense may only be reached on a Rule 12(b)(6) motion "if all facts necessary to the . . . defense 'clearly appear[] on the face of the complaint.'" (alteration in original) (emphasis omitted) (quoting Richmond, Fredericksburg & Potomac R.R. Co. v. Forst, 4 F.3d 244, 250 (4th Cir. 1993))).

While as a general rule extrinsic evidence should not be considered on a Rule 12(b)(6) motion, "when a defendant attaches a document to its motion to dismiss, 'a court may consider it in determining whether to dismiss the complaint [if] it was integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity.'" Am. Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d 212, 234 (4th Cir. 2004) (alterations in original) (quoting Phillips v. LCI Int'l, Inc., 190 F.3d 609, 618 (4th Cir. 1999)). Here, Plaintiffs relied upon their right-to-sue letters in the Amended Complaint by stating that they all received them 90 days or less before the institution of this lawsuit and by explicitly pointing to them as evidence that "[a]ll conditions precedent to the institution of this lawsuit have been fulfilled." (Doc. 4 ¶ 45.) Cf. Cohen v. Sheehy Honda of Alexandria, Inc., No. 1:06-CV-441 (JCC), 2006 WL 1720679, at *2 (E.D. Va. June 19, 2006) (relying on a Title VII plaintiff's EEOC charge attached to the defendant's Rule 12(b)(6) motion to dismiss and noting that the plaintiff "would have been unable to file a civil action without first filing such a charge with the EEOC"). Moreover, Plaintiffs have not challenged the authenticity of any of the documents attached by the City to its motion to dismiss. Therefore, the court will consider Alston's right-to-sue letter on the City's motion to dismiss.

The court finds that it clearly appears on the face of the Amended Complaint combined with Alston's right-to-sue letter that Alston filed his claim with this court around one year after receiving his right-to-sue letter. Plaintiffs do not provide any explanation or justification for this delay, nor is Alston even mentioned in Plaintiffs' response brief. Therefore, the court holds that Alston's Title VII claim is barred as untimely and will be dismissed. See Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149-51 (1984) (per curiam) (holding that the plaintiff forfeited her right to pursue a Title VII claim by failing to file her lawsuit within 90 days of receiving a right-to-sue letter); Brown v. Costco Wholesale Corp., No. PJM 09-CV-1062, 2009 WL 5170170, at *1 (D. Md. Dec. 18, 2009) (dismissing a Title VII claim because it was filed 513 days after issuance of the right-to-sue letter).

### 3. Plaintiffs who allegedly filed untimely charges of discrimination with the EEOC

The City contends that a number of Plaintiffs' Title VII claims should be dismissed because those Plaintiffs failed to timely file charges of discrimination with the EEOC. To file a claim under Title VII in federal court, a plaintiff must first exhaust his administrative remedies by filing a timely charge of discrimination with the EEOC. Bryant v. Bell Atl. Md., Inc., 288 F.3d 124, 132 (4th Cir. 2002). Title VII mandates that a

plaintiff must file this threshold charge of discrimination with the EEOC within 180 days of the alleged discriminatory act. 42 U.S.C. § 2000e-5(e)(1); EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 110 (1988).[6] Failure to timely file a charge with the EEOC bars the claim in federal court, McCullough v. Branch Banking & Trust Co., 35 F.3d 127, 131 (4th Cir. 1994), and courts have strictly enforced this requirement, Tangires v. Johns Hopkins Hosp., 79 F. Supp. 2d 587, 597 (D. Md. 2000), aff'd, 230 F.3d 1354 (4th Cir. 2000) (per curiam) (unpublished table decision). Even claims alleging a continuous violation of Title VII must allege a discriminatory act committed within the limitations period, Redding v. Anne Arundel Cnty., Md., 996 F. Supp. 488, 490 (D. Md. 1998), and discrete discriminatory acts that are timely do not save untimely acts, even if related, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 112 (2002).

Plaintiffs correctly point out that an untimely filed EEOC charge is not a jurisdictional bar. See Jones, 551 F.3d at 300 & n.2 (citing Zipes, 455 U.S. at 393). Rather, the timely filing requirement is "a requirement . . . like a statute of limitations, . . . subject to waiver, estoppel, and equitable tolling." Zipes, 455 U.S. at 393. The court therefore analyzes

---

[6] If North Carolina were a "deferral state", the time period would be 300 days. See 42 U.S.C. § 2000e-5(e)(1). However, North Carolina is a deferral state in only limited circumstances not applicable here. Bratcher v. Pharm. Prod. Dev., Inc., 545 F. Supp. 2d 533, 539-43 (E.D.N.C. 2008).

this argument under Rule 12(b)(6).  Cf. Shepard, 2009 WL 4738203, at *2 (treating defendant's Rule 12(b)(1) motion to dismiss for failure to file suit within 90 days of receiving a right-to-sue letter as a Rule 12(b)(6) motion).

Plaintiffs allege in the Amended Complaint that they filed charges with the EEOC[7] and that "[a]ll conditions precedent to the institution of this lawsuit have been fulfilled." (Doc. 4 ¶ 45.)  The City has attached the EEOC charges of a majority of Plaintiffs to its motion to dismiss.  (Docs. 8-3, 8-4, 8-5.)  As previously noted, the court may consider documents attached to the City's motion to dismiss if they were integral to and explicitly relied on in the Amended Complaint and if Plaintiffs do not challenge their authenticity.  See Am. Chiropractic Ass'n, 367 F.3d at 234.  Here, Plaintiffs specifically referenced and relied upon their EEOC charges in the Amended Complaint (see Doc. 4 ¶ 45), they could not have brought this action without first filing these charges, and they do not challenge the authenticity of the charges attached to the City's motion to dismiss.  Therefore, the court can rely on these charges in ruling on the motion.  See Cohen, 2006 WL 1720679, at *2.

---

[7]  The court assumes this factual allegation to be true at this stage. Although one footnote in the City's brief suggests that a few Plaintiffs may not have filed EEOC charges (see Doc. 8 at 5 n.9), the City provides no evidence or factual basis for this suggestion and advances arguments on other grounds.

The City contends that no discriminatory acts are alleged to have taken place after Wray's resignation as Chief which, according to the City, occurred on January 9, 2006. (Doc. 8 at 5.) Thus, the City argues, any EEOC charges filed after July 8, 2006 (180 days later), were untimely. Eighteen Plaintiffs filed their EEOC charges between July 25, 2006, and August 2, 2006 (see Doc. 8-3 at 41, 43, 47, 49; Doc. 8-4 at 14, 16, 20, 22, 24, 28, 59; Doc. 8-5 at 32, 34, 36, 40, 42, 44, 56),[8] and the City asserts that these Plaintiffs' Title VII claims should therefore be dismissed. (The EEOC charges of all other Plaintiffs either were filed before July 8, 2006, or were not submitted by the City.) In response, Plaintiffs again note generally that a Rule 12(b)(6) dismissal on limitations grounds is inappropriate unless it appears on the face of the complaint that the limitations period has run. See Goodman, 494 F.3d at 464. They also appear to challenge the argument that no discriminatory acts occurred after Wray's resignation.

The court finds that the facts necessary to the City's limitations argument do not clearly appear on the face of either the Amended Complaint or the submitted EEOC charges. The

---

[8]   These Plaintiffs are Alexander, Ellis Allen ("Allen"), Frances R. Banks ("Banks"), Michael O. Brodie ("Brodie"), William Graves ("Graves"), Milford J. Harris II ("Harris"), Hinson, Stephen L. Hunter ("Hunter"), James, John O. LeGrande ("LeGrande"), Stacy A. Morton Jr. ("Morton"), Wayne Redfern ("Redfern"), Alexander Ricketts ("Ricketts"), Ronald Rogers ("Rogers"), Eric Stevenson ("E. Stevenson"), Jermeir Jackson-Stroud ("Jackson-Stroud"), Julius Tunstall ("Tunstall"), and Allen Wallace ("Wallace").

Amended Complaint indicates that Wray resigned by sometime in January 2006 (see Doc. 4 ¶ 61), but no other dates are provided clearly establishing when the alleged discrimination ended.  For example, the Amended Complaint does not allege the date of Brady's termination.  The City contends that the court may take judicial notice of the date of Wray's termination and related dates, claiming that they are facts "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," Fed. R. Evid. 201(b), and the City submits a "Timeline of Events" published by the Greensboro News & Record.  (Doc. 8-2.)  The court need not decide whether to consider this document, because even if it did so, it would not be clear when the allegedly wrongful actions of Sanders and other non-black GPD officers toward Plaintiffs ceased. Moreover, each of the eighteen EEOC charges at issue states that the latest date discrimination took place was April 21, 2006. (See Doc. 8-3 at 41, 43, 47, 49; Doc. 8-4 at 14, 16, 20, 22, 24, 28, 59; Doc. 8-5 at 32, 34, 36, 40, 42, 44, 56.)  Because it is not clear on the face of the Amended Complaint and the submitted EEOC charges that the eighteen EEOC charges at issue were untimely, the court will not dismiss these eighteen Plaintiffs' Title VII claims on this basis.

The City also contends that the claims of Plaintiffs Evans and Willie Parker ("Parker") should be dismissed on untimeliness

grounds.  As to these two Plaintiffs, the City has submitted only their EEOC Intake Questionnaires, not their EEOC charges.[9] (Doc. 8-4 at 4-12; Doc. 8-5 at 2-10.)

Evans filed his Intake Questionnaire on August 1, 2005. (See Doc. 8-4 at 12.)  The principal allegation in the Questionnaire is that after Evans was "selected to go to General Instructor School, a private meeting was held and [he] was removed from the school" for wrongful reasons.  (Id. at 5-6.) The City has submitted an affidavit from Captain Chris Walker, who was the commanding officer in charge of the GPD's Training Department in 2004 and 2005.  (Doc. 9.)  This affidavit states that Evans attended and completed General Instructor School in October 2004.  (Id. ¶ 3.)  The City contends that Evans' alleged removal from the school must therefore have taken place before October 2004 and that his Intake Questionnaire was filed around ten months after this, outside the 180-day limitations period.

---

[9]  It is unclear whether these Intake Questionnaires are integral to and explicitly relied on in the Amended Complaint, and the parties do not address this issue in their briefs.  (The City simply states that it "will treat these Intake Questionnaires as if they are properly filed Charges of Discrimination."  (Doc. 8 at 5 n.9.))  Unlike Plaintiffs' EEOC charges and right-to-sue letters, their Intake Questionnaires are not mentioned in the Amended Complaint, and the prerequisite for bringing a Title VII lawsuit is the filing of a charge, not the filing of an Intake Questionnaire.  On the other hand, if any Plaintiff's Intake Questionnaire constituted that Plaintiff's EEOC charge, the Questionnaire would be integral to and explicitly relied on in the Amended Complaint.  See Fed. Express Corp. v. Holowecki, 552 U.S. 389, 404-06 (2008) (finding an EEOC Intake Questionnaire sufficient to constitute a charge under some circumstances).  It is unnecessary to decide this issue at this time, however, because as the following discussion shows, even if the court considers the Intake Questionnaires, the City's arguments fail.

Because the court is analyzing this argument under Rule 12(b)(6), extrinsic evidence submitted by the City will not be considered unless it is a document integral to and explicitly relied on in the Amended Complaint, as discussed already. The affidavit of Chris Walker is not integral to or relied on in the Amended Complaint, so the court will not consider the dates contained in the affidavit at this stage. Because nothing on the face of the Amended Complaint or Evans' Intake Questionnaire indicates that Evans filed an untimely EEOC charge, his Title VII claim will not be dismissed on this basis.

Parker filed his EEOC Intake Questionnaire on May 5, 2006. (See Doc. 8-5 at 10.) The Questionnaire alleges that "for no apparent reason" Parker's photograph was shown to citizens and these citizens were asked about Parker's involvement in illegal activity and associations with a drug dealer. (Id. at 3-4.) To the question "Most recent date of alleged harm . . . to you," Parker responded, "summer/04." (Id. at 3.) The City points out that this was nearly two years before the Questionnaire was filed and argues that Parker's Title VII claim should therefore be dismissed.

Notwithstanding this argument, it is not clear on the face of the Amended Complaint or Parker's Intake Questionnaire that Parker filed an untimely EEOC charge. The City has not argued that the Intake Questionnaire constituted Parker's EEOC charge,

and if it did not, the charge itself may have encompassed alleged harms occurring much later than the summer of 2004, such as the use of the line-up books alleged in the Amended Complaint.  See generally Middleton v. Motley Rice, LLC, Civil Action No. 2:08-3256-CWH, 2010 WL 3167360, at *6 (D.S.C. Aug. 9, 2010) ("[T]he EEOC Charge Form and the Intake Questionnaire serve different purposes. . . . [A]n EEOC Charge Form serves to define the scope of the [EEOC]'s investigation . . . ." (last alteration in original) (quoting Barzanty v. Verizon Pa., Inc., 361 F. App'x 411, 415 (3d Cir. 2010) (unpublished opinion))). The court declines to dismiss Parker's Title VII claim at the Rule 12(b)(6) stage for untimely filing of an EEOC charge on the basis of one answer in Parker's Intake Questionnaire.

### 4. Plaintiffs whose claims allegedly exceed the scope of their EEOC charges

The City contends that a number of Plaintiffs' Title VII claims exceed the scope of their EEOC charges and should therefore be dismissed for failure to exhaust administrative remedies.  Plaintiffs do not respond to this argument.

The scope of a Title VII action is not strictly limited by the scope of the preceding administrative charge of discrimination; rather, the suit is "confined only by the scope of the administrative investigation that can reasonably be expected to follow the charge of discrimination."  Chisholm v.

U.S. Postal Serv., 665 F.2d 482, 491 (4th Cir. 1981).  It is a "generally accepted principle [in the Fourth Circuit] that the scope of a Title VII lawsuit may extend to any kind of discrimination like or related to allegations contained in the charge and growing out of such allegations during the pendency of the case before the Commission."  Nealon v. Stone, 958 F.2d 584, 590 (4th Cir. 1992) (quoting Hill v. W. Electric Co., 672 F.2d 381, 390 n.6 (4th Cir. 1982)) (internal quotation marks omitted).  "[T]hose discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent Title VII lawsuit."  Jones, 551 F.3d at 300 (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996)).  On the other hand, "a claim in formal litigation will generally be barred if the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex."  Id.; see also id. at 301 (holding that because plaintiff's EEOC charge alleged only retaliation but not discrimination on the basis of age, sex, or race, she failed to exhaust her administrative remedies as to the discrimination claims).

The City contends that most of the Plaintiffs' EEOC charges only discuss the "Black Book," and thus all other discriminatory

25

acts alleged within the Amended Complaint exceed the scope of their EEOC charges. Twenty-four Plaintiffs' EEOC charges allege that the Plaintiff and all other black GPD officers were "intimidated and subjected to different terms and conditions of employment," and that Wray maintained a "Black Book" that negatively portrayed black officers.[10]  While the Amended Complaint contains much greater specificity, both the Amended Complaint and these EEOC charges allege the same basis for discrimination, that is, race (see Doc. 4 ¶ 111), and the court finds that the specific factual allegations in the Amended Complaint pertaining to these Plaintiffs are reasonably related to the original charges. Therefore, these Plaintiffs' Title VII claims do not exceed the scope of their EEOC charges.

The City also contends that the Amended Complaint exceeds the scope of the EEOC charges of Plaintiffs Ernest Cuthbertson ("Cuthbertson"), Evans, George M. Little ("Little"), Darrell McDonald ("McDonald"), C.L. Melvin ("Melvin"), Parker, Phifer,

---

[10]  These Plaintiffs are Alexander (Doc. 8-3 at 41); Allen (id. at 43); Banks (id. at 47); Brodie (id. at 49); Kevin E. Chandler ("Chandler") (id. at 51); Charles E. Cherry ("Cherry") (id. at 53); Darrin Davis ("Davis") (Doc. 8-4 at 2); Graves (id. at 14); Harris (id. at 16); Jonathan Heard ("Heard") (id. at 18); Hinson (id. at 20); Hunter (id. at 22); James (id. at 24); Demetrius W. Johnson ("Johnson") (id. at 26); LeGrande (id. at 28); Morton (id. at 59); Redfern (Doc. 8-5 at 32); Ricketts (id. at 34); Rogers (id. at 36); Steven Snipes ("Snipes") (id. at 38); E. Stevenson (id. at 40); Jackson-Stroud (id. at 42); Tunstall (id. at 44); and Wallace (id. at 56). Cherry's EEOC charge contains an additional allegation that complaints he filed against a fellow officer were mishandled and/or not investigated, thereby "tainting [his] record as a police officer, which consequently undermined [his] opportunities for promotion." (Doc. 8-3 at 53.)

Joseph Pryor ("Pryor"), and Michael Wayland Wall ("Wall"). However, the City has submitted only the Intake Questionnaires of these Plaintiffs, not their EEOC charges. (See Doc. 8-3 at 55-64; Doc. 8-4 at 4-12, 30-38, 40-47, 49-57; Doc. 8-5 at 2-10, 12-20, 22-30, 46-54.) The City does not argue that these Intake Questionnaires constituted the charges of these nine Plaintiffs. Therefore, the scope of these Plaintiffs' Title VII claims is not limited by the scope of their Intake Questionnaires. See Jones, 551 F.3d at 300 ("The scope of the plaintiff's right to file a federal lawsuit is determined by the *charge's* contents." (emphasis added)). Because the City has provided no other evidence that the Title VII claims of these nine Plaintiffs exceed the scope of their EEOC charges, the court will not dismiss the claims on this basis.

## C. Arguments Brought Under Rule 12(b)(6)

The City interprets the Amended Complaint as attempting to assert Title VII claims for hostile work environment, disparate treatment, and retaliation,[11] and Plaintiffs' response brief does not challenge this interpretation or indicate that any other

---

[11] The City's brief also contains a separate discussion of whether Plaintiffs have stated claims for failure to promote. (Doc. 8 at 18-19.) However, failure to promote is a form of disparate treatment. See, e.g., Anderson v. Westinghouse Savannah River Co., 406 F.3d 248, 268 (4th Cir. 2005) (discussing the requirements of a "disparate treatment claim for failure to promote"); DeWitt v. Mecklenburg Cnty., 73 F. Supp. 2d 589, 596 n.5 (W.D.N.C. 1999) (referring to "failure to promote and other types of disparate treatment cases"). Therefore, the court will not discuss failure to promote separately.

theory, such as disparate impact, is being asserted.[12]  In fact, Plaintiffs respond only to the City's arguments against their hostile work environment claims, leaving the City's other arguments unanswered.  The court will examine the allegations in the Amended Complaint and the attached City Legal Report to determine whether Plaintiffs have pleaded facts plausibly showing that they are entitled to relief for hostile work environment, disparate treatment, or retaliation.  See Iqbal, 129 S. Ct. at 1950.

Although Plaintiffs' "shotgun" complaint presents an array of generalized grievances and vague allegations, each Plaintiff individually must allege facts plausibly showing that he or she is entitled to relief.  Because of this, many of Plaintiffs' more general allegations are clearly inadequate to state a Title VII claim under any theory.  For example, Plaintiffs allege that SID officers "made numerous investigations of black officers" without following proper standards.  (Doc. 4 ¶ 80.)  Plaintiffs provide no other details about this allegation, so it is unknown which of the Plaintiffs were investigated or even whether any Plaintiffs were investigated at all.  Similarly, Plaintiffs allege that throughout Wray's and Brady's tenures at the GPD,

---

[12]  Plaintiffs' Suggestion of Subsequently Decided Authority contains a reference to "the disparate impact of Defendant's policies" (Doc. 17 at 1), but this is Plaintiffs' only use of this term.  Nowhere do Plaintiffs indicate that they are attempting to bring a disparate impact claim or explain what the nature of such a claim would be.

the City repeatedly "failed to promote black officers . . . to positions for which such officers were qualified." (Id. ¶ 106.) Again, the Amended Complaint does not indicate whether any individual Plaintiffs were among these officers, nor does it allege any specific instances in which a Plaintiff was qualified for and denied a particular promotion.

Even where the Amended Complaint names specific victims of the alleged discrimination, they are not always Plaintiffs. For example, the Amended Complaint alleges that Wray excluded two black Assistant Chiefs, Tim Bellamy and Annie Stevenson, from "the decision-making process." (Id.) Neither is a Plaintiff, however. Allegations like these do not show that any individual Plaintiff is entitled to relief.

### 1. Hostile Work Environment

The City argues that the Amended Complaint does not allege facts sufficient to state a hostile work environment claim for any Plaintiff. Plaintiffs respond that they have pleaded facts satisfying the plausibility standard of Twombly and Iqbal and giving the City fair notice of the nature of their claims.

Title VII provides that it is an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1). This provision creates a hostile work

environment cause of action. <u>See</u> <u>EEOC v. Cent. Wholesalers,</u> <u>Inc.</u>, 573 F.3d 167, 174 (4th Cir. 2009). To state such a claim, each Plaintiff must allege harassment that was (1) unwelcome, (2) based on race, and (3) "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere," and for which (4) "there is some basis for imposing liability on the employer." <u>Bass</u>, 324 F.3d at 765.

Here, Plaintiffs allege that Wray and Brady "directed subordinate officers to gather pictures of black officers of the Greensboro Police Department for the use of line-up books or other visuals [sic] aids . . . for the purpose of framing, embarrassing, and wrongfully investigating and charging black officers." (Doc. 4 ¶ 48.) Plaintiffs allege, upon information and belief, that their "photographs, likenesses, and/or names were included in at least one version of the [l]ine-[u]p [b]ooks." (<u>Id.</u> ¶ 49.) Non-black GPD officers allegedly "presented the [l]ine-[u]p [b]ooks to members of the general public, including known convicted criminals and criminal suspects," to elicit false allegations against black GPD officers. (<u>Id.</u> ¶ 50; <u>see id.</u> ¶¶ 48, 56.) Plaintiffs also allege that Wray and Brady authorized the creation of a digital photograph array of all black GPD officers, and that Sanders placed this array on his employer-issued laptop computer and

showed it to criminals or suspected criminals to elicit false allegations against black GPD officers. (Id. ¶ 49.)

Plaintiffs have alleged that the creation and use of the line-up books and digital photograph array were unwelcome (see id. ¶ 120) and based on race (see id. ¶¶ 66, 110). The court must determine whether Plaintiffs plausibly allege harassment "sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere" and whether there is some basis for imposing liability on the City.

In analyzing whether the alleged harassment was "sufficiently severe or pervasive," the court must examine the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir. 2001) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)). The conduct must create an "objectively hostile or abusive" work environment, and the victim must "perceive the environment to be abusive." Id.

In Spriggs, the Fourth Circuit held that a reasonable jury could find a hostile work environment existed where the plaintiff was exposed on a daily basis to "incessant racial slurs, insults, and epithets" by his supervisor, some directed

at the plaintiff himself, others directed at other African-Americans. Id. at 182, 184-86. Here, Plaintiffs' photographs (and perhaps other personal information) were allegedly placed into line-up books and a digital photograph array, and at least some of these photographs were allegedly shown to criminal defendants, criminal suspects, and the general public for the purpose of developing criminal charges against one or more black GPD officers. (See Doc. 4 ¶¶ 48-50, 56, 63, 66.) If these allegations are true, the existence and use of the line-up books and digital photograph array may have put each Plaintiff at risk of false criminal accusations, targeting by criminals, or other harm. At this pleading stage, it is reasonable to infer that Plaintiffs were aware of these actions, since there were "rumors" about the line-up books at least throughout a several-month period in 2005. (See id. ¶ 55; Doc. 5 at 30-31.) The rumors were prevalent enough that Sanders was asked about the line-up books during a Command Staff briefing in June 2005 (Doc. 5 at 30) and Wray later claimed to have been "gravely concerned by this rumor" (Doc. 4 ¶ 55). However, the GPD leadership allegedly took no significant action to dispel the rumors. (Doc. 5 at 30-31.) Therefore, the court finds that Plaintiffs' Amended Complaint alleges facts plausibly stating the first three elements of a hostile work environment claim.

As to the fourth element, the City argues that Plaintiffs have failed to allege facts showing a basis for imposing liability on the City. The City cites Caldwell v. Johnson, 289 F. App'x 579 (4th Cir. 2008) (unpublished per curiam opinion), for the proposition that a Title VII plaintiff can prevail on a claim for hostile work environment "arising from the actions of her coworkers only if the [employer] 'was negligent in failing, after actual or constructive knowledge, to take prompt and adequate action to stop it.'" Id. at 586-87 (quoting Howard v. Winter, 446 F.3d 559, 567 (4th Cir. 2006)) (internal quotation marks omitted). The City asserts that Plaintiffs' hostile work environment claim is restricted to alleged actions by "Officer Sanders and other Police Department employees." (Doc. 8 at 16.) The City then argues, without further explanation, that the standard for coworker hostile work environment claims applies, and it contends that Plaintiffs have not alleged failure by the City to "take prompt and adequate action" to end the harassment after receiving "actual or constructive knowledge" of it. The City points out that in response to Plaintiffs' allegations, it conducted an internal investigation and engaged an outside consultant to investigate the alleged harassment. (Doc. 4 ¶¶ 90, 96-98.)

The City overlooks Plaintiffs' allegations that Wray and Brady were directly responsible for the creation and use of the

line-up books and digital photograph array. (See id. ¶¶ 48-49;
see also ¶ 114 (alleging generally that Plaintiffs suffered a
hostile work environment "as a direct and proximate result of
the policies and practices of Wray, Brady, and others").)
Therefore, the "other Police Department employees" mentioned by
the City include supervisors of Plaintiffs. It is a reasonable
inference from the Amended Complaint that Wray, at least, had
"the ability 'to take tangible employment actions against
[Plaintiffs], such as hiring, firing, failing to promote,
reassignment with significantly different responsibilities, or a
decision causing a significant change in benefits.'" Howard,
446 F.3d at 566 (quoting Mikels v. City of Durham, N.C., 183
F.3d 323, 333 (4th Cir. 1999)) (internal quotation marks
omitted). This ability is "[t]he most powerful indication of
supervisory status," id., and indicates that Wray was a
supervisor of Plaintiffs rather than a coworker. In addition,
Brady may have had supervisory authority over certain Plaintiffs
(see, e.g., Doc. 4 ¶ 69 (alleging that the SID was "under the
direct supervision of Brady")). Construing all factual
allegations in the light most favorable to Plaintiffs, the court
finds that the applicable rule is that for hostile work
environment claims based upon the actions of supervisors, not
coworkers. Plaintiffs briefly argue that this standard should

apply (see Doc. 15 at 16 n.9), and the City's reply brief does not respond.

"[I]n a case of harassment by a supervisor 'with immediate (or successively higher) authority over the employee,' an employer is vicariously liable for the harassment." Howard, 446 F.3d at 565 (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)); see Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998). If no tangible employment action was taken against the employee, the employer may raise an affirmative defense by establishing "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." Faragher, 524 U.S. at 807. Because the City has not raised this affirmative defense or provided any arguments in favor of it, the court will not discuss it further.

Plaintiffs have plausibly stated a Title VII claim for hostile work environment, and this claim may proceed. Whether the alleged harassment was, and was perceived to be, sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere as to each Plaintiff will be subject to discovery and further proof. Because of this

holding, the court need not analyze Plaintiffs' other allegations under the hostile work environment rubric.

## 2. Disparate Treatment

The City apparently concedes that Plaintiffs Alexander and Evans have alleged facts sufficient to state disparate treatment claims. (<u>See</u> Doc. 8 at 16 n.16.) Therefore, these two Plaintiffs' Title VII disparate treatment claims may proceed.[13]

The City argues that all other Plaintiffs' claims for disparate treatment should be dismissed for failure to plead facts showing the Plaintiffs suffered adverse employment actions. Plaintiffs have not responded to this argument.

## a. All Plaintiffs

The only allegations in the Amended Complaint that clearly pertain to each Plaintiff and that possess the factual specificity needed to state any claim are the allegations concerning the creation and use of the line-up books and digital photograph array that allegedly contained the photographs of all Plaintiffs. Although Plaintiffs allege that non-black officers did not receive this treatment (Doc. 4 ¶¶ 66, 110), these allegations do not successfully state a claim for disparate treatment under Title VII.

---

[13] The court notes that Alexander's claim appears to be for disparate discipline, the elements of which are simply a variation on the usual disparate treatment elements. <u>See</u> <u>Moore v. City of Charlotte, N.C.</u>, 754 F.2d 1100, 1105-06 (4th Cir. 1985).

To make out a prima facie disparate treatment claim in the employment setting, Plaintiffs must establish that (1) they are members of a protected class, (2) they suffered an adverse employment action, (3) they were performing in a manner that satisfied their employer's legitimate job expectations, and (4) the adverse employment action occurred "under circumstances which give rise to an inference of unlawful discrimination." Jenkins v. Trs. of Sandhills Cmty. Coll., 259 F. Supp. 2d 432, 443 (M.D.N.C. 2003) (quoting EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n.2 (4th Cir. 2001)), aff'd, 80 F. App'x 819 (4th Cir. 2003) (unpublished per curiam opinion); see Holland v. Wash. Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007).

While Plaintiffs' complaint need not allege facts that constitute a prima facie case, see Jordan, 458 F.3d at 346, they must still "allege facts sufficient to state all the elements of [their] claim," id. (emphasis omitted) (quoting Bass, 324 F.3d at 765).  A key element that Plaintiffs must allege is that they each suffered an "adverse employment action."  See Harman v. Unisys Corp., 356 F. App'x 638, 641 (4th Cir. 2009) (unpublished per curiam opinion) (citing Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981) (en banc)); Hoffman v. Balt. Police Dep't, 379 F. Supp. 2d 778, 792 (D. Md. 2005) ("It is well settled that to state a cause of action for disparate treatment under Title VII . . . the plaintiff must allege that he suffered an 'adverse

employment action.'"); cf. Fletcher v. Philip Morris USA Inc.,
No. 3:09-CV-284 (HEH), 2009 WL 2067807, at *5-*6 (E.D. Va. July
14, 2009) (analyzing, in the context of a disparate treatment
claim under 42 U.S.C. § 1981, whether the plaintiff sufficiently
alleged an adverse employment action).

An "adverse employment action" is "a discriminatory act
that 'adversely affect[s] the terms, conditions, or benefits of
the plaintiff's employment.'" Holland, 487 F.3d at 219
(alteration in original) (quoting James v. Booz-Allen &
Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004)). While
"[c]onduct short of ultimate employment decisions can constitute
adverse employment action," James, 368 F.3d at 375-76 (quoting
Von Gunten v. Maryland, 243 F.3d 858, 865 (4th Cir. 2001),
abrogated on other grounds by Burlington N. & Santa Fe Ry. Co.
v. White, 548 U.S. 53 (2006)) (internal quotation marks
omitted), the "typical requirements for a showing of an 'adverse
employment action'" are "discharge, demotion, decrease in pay or
benefits, loss of job title or supervisory responsibility, or
reduced opportunities for promotion," Boone v. Goldin, 178 F.3d
253, 255 (4th Cir. 1999). For example, the Fourth Circuit has
held that a reassignment only constitutes an "adverse employment
action" if the reassignment has a "significant detrimental
effect" on the plaintiff. Id. at 256. "[E]ven if the new job .
. . cause[s] some modest stress not present in the old

38

position," reassignment to a new position "commensurate with one's salary level" is not an "adverse employment action" unless there is a "decrease in compensation, job title, level of responsibility, or opportunity for promotion." Id. at 256-57. As another example, "a poor performance evaluation 'is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment.'" James, 368 F.3d at 377 (quoting Spears v. Mo. Dep't of Corr. & Human Res., 210 F.3d 850, 854 (8th Cir. 2000)). "An evaluation merely causing a loss of prestige or status is not actionable." Id.

Here, Plaintiffs have not alleged facts showing any concrete harm resulting from the creation of the line-up books or digital photograph array, let alone any harm involving the "terms, conditions, or benefits" of their employment. It is unclear from Plaintiffs' allegations whether all of the claimed line-up books and photographs were shown to criminals and suspected criminals. If only some were, it is not clear which Plaintiffs' photographs were shown,[14] nor is it clear how each individual Plaintiff was affected by all this. The most serious allegation is that the line-up books "resulted in the exposure

---

[14] The City Legal Report attached to Plaintiffs' Amended Complaint indicates that Patterson's photograph was shown to "witnesses," but no further details are provided. (See Doc. 5 at 30.) In any event, Patterson's Title VII claim has already been dismissed for lack of subject matter jurisdiction.

of black officers . . . who were working undercover" (Doc. 4 ¶ 50), but Plaintiffs do not allege any additional facts showing how this entitles any individual Plaintiff to relief.  The only alleged harm applicable to each Plaintiff is the creation of the line-up books and digital photograph array itself, and this does not satisfy the definition of an actionable "adverse employment action."  Therefore, these allegations do not state a claim for disparate treatment.

The court will now consider allegations involving individual Plaintiffs to determine whether any individual Plaintiff may pursue a disparate treatment claim.

### b.  Plaintiff Antuan Hinson

The Amended Complaint alleges that Sanders (at the direction of Wray and Brady) secretly placed keystroke-monitoring devices on the computers of several black GPD officers, including Hinson, without justification, that Sanders monitored Hinson's keystrokes to determine his password, and that he used that password to enter Hinson's email account and download one year of Hinson's emails.  (Doc. 4 ¶ 101.)  Sanders allegedly admitted to these actions in early 2009.  (Id.)  Hinson alleges that these actions violated GPD policies and that no keystroke-monitoring devices have been used on any non-black officer's computer.  (Id. ¶¶ 102-03.)

The court finds that Hinson has not stated a claim for disparate treatment, because he has not alleged any "adverse employment action" — the GPD Defendants took no action affecting the "terms, conditions, or benefits" of Hinson's employment. Cf. Skipper v. Giant Food, Inc., 187 F. Supp. 2d 490, 492-94 (D. Md. 2002) (holding that the employer's surveillance of plaintiff at work, followed by an announcement of his productivity over a company loudspeaker, was not an "adverse employment action" for purposes of a disparate treatment or disparate discipline claim under Title VII, since these actions did not lead to any discipline or any change in the terms, conditions, or benefits of plaintiff's employment), aff'd, 68 F. App'x 393 (4th Cir. 2003) (unpublished per curiam opinion). Moreover, violation of GPD policies, without more, does not provide grounds for a Title VII disparate treatment claim.

### c.    Plaintiff Brian James

According to the City Legal Report attached to the Amended Complaint, James was monitored and then criminally interrogated by SID officers after allegedly associating with known offenders, although this is only a policy violation, not a crime. (Doc. 5 at 20.) James alleges that his criminal interrogation by Sanders and SID was discriminatory, claiming that (a) his offense did not warrant criminal questioning and (b) "the investigations 'were administrative, and should not

have been undertaken by Detective Sanders.'" (Doc. 4 ¶ 95 (quoting Doc. 5 at 39).) When James asked for an administrative inquiry or investigation to clear his name, his superiors did not honor this request. (Doc. 5 at 20.) After Officer Domitrivits, a white officer, allegedly associated with a known offender, she was given counseling and was instructed not to commit this violation again, but no investigation took place. (Id.)

James has not alleged that any disciplinary measures were taken against him, nor has he alleged any adverse effect upon the terms, conditions, or benefits of his employment. See Dawson v. Rumsfeld, No. 1:05-CV-1270 (JCC), 2006 WL 325867, at *6 (E.D. Va. Feb. 8, 2006) (inferring from Fourth Circuit case law that "the mere decision to initiate an investigation is not an adverse employment action"); Hoffman, 379 F. Supp. 2d at 792 (stating, in response to a "disparate investigation" claim, that "[t]he few courts that have considered whether an investigation, by itself, can constitute an adverse employment action have answered that question in the negative"); see also Locklear v. Person Cnty. Bd. of Educ., No. 1:05-CV-255, 2006 WL 1743460, at *7 (M.D.N.C. June 22, 2006) ("[A] suspension with pay during an investigation into a complaint about a doctored answer sheet

cannot constitute an adverse employment action.").[15]  Moreover, James has not alleged that any concrete investigative findings were made against him from which he wishes his name to be cleared or that he received any reprimand — he has alleged only the investigation itself.  Cf. James, 368 F.3d at 377 ("[A performance] evaluation merely causing a loss of prestige or status is not actionable."); Skipper, 187 F. Supp. 2d at 493-94, 494 n.4 (citing Keenan v. Am. Cast Iron Pipe Co., 707 F.2d 1274, 1277 (11th Cir. 1983)) (holding that a written warning alone is not an "adverse employment action," but indicating that a reprimand that cannot be expunged from the employee's file and that might affect the employee's ability to secure promotions and credit may be an "adverse employment action").  Consequently, James has not stated a claim for disparate treatment.

### d.  Plaintiff Norman Rankin

(1) Discriminatory Investigation:  According to the City Legal Report, Norman Rankin ("Rankin") was criminally investigated by SID for alleged connections to known offenders "in order to clear [him] of violating the Department's

---

[15]  An investigation may be a sufficient adverse action in the context of a retaliation claim.  See Hetzel v. Cnty. Of Prince William, 89 F.3d 169, 171-72 (4th Cir. 1996); cf. Williams v. Hansen, 326 F.3d 569, 585 n.1 (4th Cir. 2003) (King, J., dissenting) (citing Hetzel in the context of an equal protection claim).  However, the definition of "adverse action" in the retaliation context is broader than the definition of "adverse employment action" in the disparate treatment context.  See White, 548 U.S. at 67.

directives against associating with known offenders." (Doc. 5 at 21.), and he was cleared (id.). Officer T.V. Moore, a white officer, was not investigated for allegedly more significant connections to known offenders. Instead, he was consulted by his supervisor about how he wanted the incident handled. (Id.) Like James, Rankin has not alleged that any disciplinary measures were taken against him, nor has he alleged any adverse effect upon the terms, conditions, or benefits of his employment. The investigation itself, standing alone, does not constitute an "adverse employment action." See Dawson, 2006 WL 325867, at *6; Hoffman, 379 F. Supp. 2d at 792. Therefore, these allegations do not state a claim for disparate treatment.

*(2) Discussion of Personnel Information:* The Amended Complaint also alleges generally that in a June 2005 meeting with the Greensboro Police Officers Association, Wray "publicly discussed the details of investigations into allegations of criminal conduct, identifying by name various black officers of the Greensboro Police Department in connection with such investigations." (Doc. 4 ¶ 112.) The City Legal Report states that at this meeting, Wray "improperly and maliciously discussed confidential personnel matters" involving Rankin, Patterson (whose Title VII claim has been dismissed), and two black officers who are not Plaintiffs in this case. (Doc. 5 at 11.) Wray's actions allegedly violated North Carolina law. (Id.)

Plaintiffs do not allege what information was revealed or how Rankin or the other officers were affected, other than that Wray pointed at Rankin and stated, "We looked at you too, but cleared you," or words to that effect. (Doc. 4 ¶ 112.) These allegations do not state a claim for disparate treatment, because Rankin does not allege that he suffered any "adverse employment action." Cf. Skipper, 187 F. Supp. 2d at 493-94 (holding that disclosure of plaintiff's job performance via a company loudspeaker was not an "adverse employment action").

### e. Plaintiffs Rankin and Cuthbertson

*(1) Undercutting of Plaintiffs' Investigation:* According to the City Legal Report, Rankin and Cuthbertson, both officers within the SID, were assigned the investigation of Snipes for possible association with prostitutes. (Doc. 5 at 25.) Sanders requested that a white officer (Sloan) continue to be involved in this investigation, expressing doubt that Rankin and Cuthbertson were competent. (Id.) Sanders told Sloan, who had initiated the investigation, not to share all the information he knew with Rankin or Cuthbertson and not to let them meet with a crucial informant. (Id.) Sanders said that he wanted Rankin to fail so that Wray would assign this investigation "back to us." (Id. at 25-26.) These allegations do not state a disparate treatment claim, because even assuming that similarly situated non-black officers received different treatment, Rankin and

Cuthbertson have not alleged any "adverse employment action." See generally Boone, 178 F.3d at 256 (holding that even reassignment to a less appealing position is not an "adverse employment action" unless it has "some significant detrimental effect" on the plaintiff).

*(2) Fake Investigations:* Cuthbertson also alleges that he was repeatedly assigned to investigate fabricated criminal activity so that in his absence the other SID officers could investigate black GPD officers. (Doc. 4 ¶ 107.) Like Cuthbertson's previous allegation, this allegation fails to satisfy the "adverse employment action" requirement and does not state a disparate treatment claim.

### f. Plaintiff Joseph Pryor

*(1) Improper Administrative Pressure:* No specific factual allegations concerning Pryor are provided in the Amended Complaint. However, the attached City Legal Report, incorporated by reference into the Amended Complaint, alleges that Pryor was criminally and then administratively investigated for an improper arrest and use of force.[16] (Doc. 5 at 19.) After these investigations were closed and Pryor was administratively disciplined, Wray allegedly brought improper

---

[16] The court assumes that the "Officer Pryor" discussed in the City Legal Report is the same as Plaintiff Joseph Pryor.

pressure on Captain Tony Phifer ("Captain Phifer")[17] to increase the discipline imposed on Pryor. Captain Phifer acquiesced to Wray's request. (Id.)

Pryor has not alleged facts plausibly showing that his increased discipline was because of his race. See Coleman v. Md. Court of Appeals, 626 F.3d 187, 191 (4th Cir. 2010) (dismissing a Title VII disparate treatment claim where "the complaint fail[ed] to establish a plausible basis for believing . . . that race was the true basis for [plaintiff's] termination"); cf. Jordan, 458 F.3d at 346-47 (dismissing a section 1981 discrimination claim where the court could not "discern [from plaintiff's alleged facts] any way that [plaintiff's] race factored into his termination"). The Amended Complaint and City Legal Report contain no examples, black or non-black, of a similarly situated GPD officer (i.e., one disciplined for the unwarranted use of force), let alone one who received different treatment. Cf. Herbig v. Int'l Bus. Machs. Corp., 796 F. Supp. 865, 866 (D. Md. 1992) ("[T]he sine qua non of a disparate discipline claim in this Circuit [is an allegation that] others, not within [plaintiff's] protected group[], who engaged in comparable prohibited conduct, were more favorably treated (less severely disciplined) than was

---

[17] It is unclear whether Captain Tony Phifer is the same person as Plaintiff William A. Phifer.

[plaintiff].”), aff'd, 998 F.2d 1009 (4th Cir. 1993) (per curiam) (unpublished table decision). The Amended Complaint states that "[a]ll of the examples in the City Legal Report of such coercion by David Wray leading to increased discipline or less favorable evaluations were targeted upon black officers" (Doc. 4 ¶ 92), and the City Legal Report does list three instances of "improper administrative pressure" involving black GPD officers (see Doc. 5 at 18-19). However, the Report also alleges pressure brought by Wray upon Assistant Chief Tim Bellamy to lower the evaluation of a fourth officer, Captain Anita Holder ("Holder"), whose race is not alleged. (Id. at 19.) Moreover, Plaintiffs acknowledge that the instances discussed in the City Legal Report are merely "examples." Thus, Pryor's claim would require the court to infer, without any factual basis, that Holder is also black, that the "examples" provided in the City Legal Report were the only instances of such disciplinary treatment (or that if other instances occurred, none affected white officers), that therefore only black officers received such treatment, and that this indicates Wray's actions toward Pryor individually were motivated by Pryor's race. The court does not find this to be a reasonable chain of inferences from the facts provided in the City Legal Report. Cf. Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999) (noting that at the Rule 12(b)(6) stage, the

court must "draw[] all *reasonable* factual inferences . . . in the plaintiff's favor" (emphasis added)).

Moreover, although the Amended Complaint states that "the only example in the City Legal Report of improper administrative pressure by Defendants to *decrease* disciplinary action involved a white employee" (Doc. 4 ¶ 92), the employee described (Corporal Cheryl Cundiff ("Cundiff")) was charged with a very different offense than Pryor (untruthfulness rather than unwarranted use of force), and the City Legal Report itself states that Cundiff's husband "was a close friend of Chief Wray and Deputy Chief Brady" and speculates that this "may account for the favorable treatment she received during this investigation," (Doc. 5 at 14-15). Cf. Morris-Belcher v. Hous. Auth. of the City of Winston-Salem, No. 1:04-CV-255, 2005 WL 1423592, at *7 (M.D.N.C. June 17, 2005) (stating that "the law is clear that giving preferential treatment to friends or social acquaintances does not violate Title VII"). Although the Amended Complaint alleges that "Plaintiffs' race was at least a motivating factor for each of the unlawful employment practices described herein" (Doc. 4 ¶ 111), such a conclusory statement is insufficient to state a Title VII disparate treatment claim, see Coleman, 626 F.3d at 190-91. Moreover, as noted above, violation of GPD disciplinary policies, standing alone, does not provide grounds for a Title VII claim. The court finds that

these allegations by Pryor do not independently support a Title VII disparate treatment claim.[18]

*(2) Potential Improper Investigation:* The City Legal Report also alleges that in violation of GPD directives, a criminal investigation of Pryor was ordered after he had already been investigated criminally and then administratively. After Captain Phifer met with Wray and protested this action, the investigation was canceled. (Doc. 5 at 26.) Suffice it to say that Pryor is not entitled to relief under a disparate treatment theory for an investigation that almost happened.

### g. Plaintiff William A. Phifer

The Amended Complaint alleges that Wray brought improper pressure on a supervisor of Phifer that resulted in an increased level of discipline for him. (Doc. 4 ¶ 92.) This allegation would fail to state a disparate treatment claim for the same reason as Pryor's improper-pressure allegation: Phifer has not alleged facts plausibly showing that his increased discipline was because of his race — moreover, Phifer has alleged no factual details at all about this claim.

However, it appears that Plaintiffs have misstated this allegation, since the Amended Complaint cites to the passage in

---

[18] If the "Officer Stacey Morten" mentioned in the City Legal Report is the same as Plaintiff Stacy A. Morton Jr., then Morton makes a similar allegation of improper pressure from Wray. (See Doc. 5 at 18-19.) This allegation fails to state a disparate treatment claim for the same reasons as Pryor's allegation.

the City Legal Report describing how pressure was brought *upon Captain Phifer* to increase the disciplinary measures taken *against Pryor* for Pryor's unwarranted use of force. (Doc. 5 at 19.) It is unclear whether Captain Tony Phifer is the same person as Plaintiff William A. Phifer. If so, Plaintiff Phifer has no disparate treatment claim for the pressure brought upon him to increase another officer's disciplinary level, because Phifer himself did not receive any discipline and did not suffer any "adverse employment action." Furthermore, Phifer has alleged no facts plausibly showing that the pressure placed upon him was because of *Phifer's* race.

### h. Plaintiff Stephen L. Hunter

*(1) Inappropriate Discipline:* In the Amended Complaint, Hunter alleges that he was falsely accused of damaging a patrol car that he shared with several other officers and was "given documented discipline." (Doc. 4 ¶ 93.) After Hunter threatened to file a grievance with the City Manager, the memorandum documenting his violation and recommended discipline was rescinded. (Id.; Doc. 5 at 36.) Presumably the rescission of the memorandum shows that Hunter never should have been charged in the first place. However, because Hunter ultimately received no discipline and suffered no "adverse employment action," these allegations do not state a claim for disparate treatment.

*(2) Retaliatory Investigation:*  The Amended Complaint also alleges that shortly after Hunter threatened to file his grievance, Cherry was instructed to investigate Hunter's off-duty time reporting to establish evidence of possible fraud. (Doc. 4 ¶ 93.)  After a preliminary inquiry, Cherry ended the investigation, finding insufficient grounds for continuing. (Doc. 5 at 23-24.)  Meanwhile, Cherry learned of facts supporting an allegation of improper off-duty time reporting by Officer Heinrich ("Heinrich"), a white officer, and Cherry reported these facts to his superior.  However, no investigation into Heinrich's actions ever took place.  (Id. at 24.)  Because no disciplinary measures were taken against Hunter and he suffered no "adverse employment action," see Dawson, 2006 WL 325867, at *6 ("[T]he mere decision to initiate an investigation is not an adverse employment action."), his allegations do not state a claim for disparate discipline or for disparate treatment generally.

### i.  Plaintiff Steven Snipes

The City Legal Report states that Snipes' name "keeps appearing and being linked to prostitutions and illicit parties."  (Doc. 5 at 30.)  At one point, SID began an investigation into Snipes.  (Id.)  The City Legal Report states that no support has ever been found for any link between Snipes and prostitutes.  (Id.)  As noted above, an investigation,

without more, is not an "adverse employment action" and does not support a disparate treatment claim.

### j. "Assistant Chief Stevenson"

The City Legal Report states that Wray held informal meetings of his command staff after hours at a local restaurant, but that "Assistant Chief Stevenson" and two other black officers were not invited to these meetings until "Assistant Chief Stevenson" questioned their exclusion. (Id. at 24.) After this, Wray invited them to the meetings, but they apparently never attended. (Id.) It is unclear whether these allegations refer to E. Stevenson, D. Stevenson (whose Title VII claim has been dismissed for lack of subject matter jurisdiction), or Assistant Chief Annie Stevenson, who is not a Plaintiff in this action, although Assistant Chief Annie Stevenson seems the most likely candidate. (See Doc. 4 ¶ 106.) Regardless, no "adverse employment action" is alleged, so these allegations do not support a disparate treatment claim.

### k. Summary

The court has carefully reviewed the Amended Complaint and the attached City Legal Report. None of Plaintiffs' other allegations states facts showing that any individual Plaintiff is entitled to relief under any form of disparate treatment theory (including disparate discipline and failure to promote). Therefore, the court holds that the disparate treatment claims

of Alexander and Evans may proceed, and the disparate treatment claims of all other Plaintiffs are dismissed.

### 3. Retaliation

The Amended Complaint alleges that the City publicly disclosed confidential and protected personnel information of some or all Plaintiffs in retaliation for Plaintiffs' assertion of employment discrimination claims before the EEOC. (See Doc. 4 ¶¶ 115-19.) The City argues that the Amended Complaint is devoid of any facts that support these allegations as to any Plaintiff other than Rankin. As for Rankin, the City contends that his claim fails because the alleged retaliatory disclosures occurred before he filed any document with the EEOC. Plaintiffs do not respond to these arguments.

Title VII's prohibition on retaliation states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). To state a Title VII retaliation claim, a plaintiff must allege that (1) he engaged in a "protected activity," (2) the employer acted adversely against him, and (3) the adverse action was taken because of the protected activity. Bryant v. Aiken Reg'l Med. Ctrs. Inc., 333 F.3d 536, 543 (4th

Cir. 2003); see Coleman, 626 F.3d at 190-91 (applying these elements in the Rule 12(b)(6) context). The "adverse action" required in the retaliation context is different from the "adverse employment action" required in the disparate treatment context. See White, 548 U.S. at 67. A retaliation plaintiff must show that "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from'" engaging in the protected activity. Id. at 68 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)) (internal quotation marks omitted).

The Amended Complaint alleges that "[the City's] public disclosure of confidential and protected personnel information were [sic] undertaken by them as part of an intentional scheme of conduct to harass, intimidate, retaliate against, and damage Plaintiffs due to . . . their assertion of employment discrimination claims before the EEOC." (Doc. 4 ¶ 115.) It is unclear to what alleged actions this statement alludes, but it may refer to the allegation (discussed earlier) that "in a meeting with the Greensboro Police Officers Association in about June 2005, [Wray] publicly discussed the details of investigations into allegations of criminal conduct, identifying by name various black officers of the Greensboro Police Department in connection with such investigations." (Id.

¶ 112.) The Amended Complaint further alleges that the City's disclosure was motivated by an intention "to cause Plaintiffs to suffer injury that would likely chill persons of ordinary firmness from continuing to engage in Constitutionally protected activity, including the filing of complaints with and pursuit of redress from the EEOC." (Id. ¶ 116.) According to the Amended Complaint, the City's alleged disclosure was "undertaken in bad faith and for discriminatory reasons" (id. ¶ 117), "was not related to any legitimate government objective" (id. ¶ 118), and to the extent it was not intentional, was "the product of deliberate indifference, malice, willfulness, and/or retaliation by Defendant" (id. ¶ 119). The City argues that these are nothing more than conclusory statements and that the Amended Complaint is devoid of any factual allegations supporting these assertions.

The City is correct that the Amended Complaint contains virtually no factual allegations regarding these supposed retaliatory disclosures. Aside from Patterson (whose claim has already been dismissed) and Rankin, the Amended Complaint and City Legal Report do not allege that any Plaintiffs were discussed by Wray at the June 2005 meeting. Moreover, Plaintiffs do not allege what information was disclosed at this meeting, other than that Wray pointed at Rankin and stated, "We looked at you too, but cleared you," or words to that effect.

(Id. ¶ 112.) The Amended Complaint does not allege any other specific incident involving the disclosure of personnel information. Plaintiffs have wholly failed to allege facts sufficient to "nudge[] their claims across the line from conceivable to plausible," Twombly, 550 U.S. at 570, with the possible exception of Rankin.

As to Rankin, the City contends that even assuming his allegations about the June 2005 meeting are otherwise sufficient to support a retaliation claim, Rankin did not file his EEOC Intake Questionnaire until May 5, 2006, rendering it impossible for the alleged disclosures in June 2005 to have been in retaliation for that filing. (See Doc. 8-5 at 66.) Plaintiffs do not respond to this argument.

Even if the court does not consider the Intake Questionnaire, which was submitted by the City with its motion to dismiss, Rankin's allegations do not state a retaliation claim, because there are no alleged facts plausibly showing a causal connection between the alleged disclosures in June 2005 and some prior "protected activity" engaged in by Rankin. See, e.g., Gainer v. Spotswood Country Club, No. 5:10-CV-85, 2010 WL 5186699, at *4 (W.D. Va. Dec. 9, 2010) ("[T]o state a claim for retaliation, [plaintiff] must allege 'that he opposed an unlawful employment practice or participated in a charge or other proceeding under Title VII; that he has suffered an

adverse employment action; and that there is a causal connection between the two.'" (quoting <u>Balazs v. Liebenthal</u>, 32 F.3d 151, 158 (4th Cir. 1994))).

Therefore, the court finds that all Plaintiffs' retaliation claims based upon wrongful disclosure of personnel information fail.

The City interprets Plaintiffs' retaliation claims as reaching no further than this, and Plaintiffs' response brief does not challenge that interpretation. The court has carefully examined the Amended Complaint and the City Legal Report and is unable to find any other factual allegations plausibly stating a retaliation claim in any other context. The only allegations remotely suggesting retaliatory activity are Hunter's allegations that after he threatened to file a grievance with the City Manager, Cherry was instructed to investigate Hunter's off-duty time reporting to establish evidence of possible fraud. (Doc. 4 ¶ 93; Doc. 5 at 23 & n.6.) After a preliminary inquiry, Cherry ended the investigation, finding insufficient grounds for continuing. (Doc. 5 at 23-24.) Even assuming that Hunter's threat to file a grievance was "protected activity," the action allegedly taken against him in retaliation was not "adverse action" under <u>White</u>. The only action taken against Hunter was a preliminary inquiry that ended very quickly. Hunter has not alleged that he was affected by this preliminary inquiry at all;

indeed, he does not even allege that he was questioned during the inquiry. Consequently, Hunter has failed to show a "materially adverse" action against him.

Therefore, all Plaintiffs' Title VII retaliation claims will be dismissed.

## III. CONCLUSION

For the reasons set forth above,

IT IS THEREFORE ORDERED that Defendant City of Greensboro's Motion to Dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) (Doc. 7) is GRANTED IN PART AND DENIED IN PART. The motion is GRANTED as to all Title VII claims brought by Plaintiffs Ahmed Blake, Larry Patterson Jr., Frank Young, and Darryl Stevenson, which are DISMISSED WITH PREJUDICE under Rule 12(b)(1) for lack of subject matter jurisdiction. The motion is GRANTED as to all Title VII claims brought by Plaintiff Mitchell Alston, which are DISMISSED WITH PREJUDICE under Rule 12(b)(6) as untimely. The motion is DENIED as to (1) all other Plaintiffs' hostile work environment claims under Title VII, (2) Plaintiff Steven A. Evans' disparate treatment claim under Title VII, and (3) Plaintiff Lawrence Alexander Jr.'s disparate treatment claim under Title VII. The motion is GRANTED as to all other Title VII claims brought by Plaintiffs, which are DISMISSED WITH PREJUDICE for failure to state a claim pursuant to Rule 12(b)(6).

/s/   Thomas D. Schroeder
                                        United States District Judge

January 4, 2011